IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No.: 4:13-cr-00153-RBH |
| | ) | |
| v. | ) | |
| | ) | **ORDER** |
| Ernesto Ivan Jeronimo-Rodas and | ) | |
| Daniel Jeronimo-Rodas. | ) | |
| | ) | |

This matter is before the Court following a hearing held on May 21, 2013, regarding a Motion to Suppress filed by Defendant Ernesto Ivan Jeronimo-Rodas and a Motion to Suppress filed by Defendant Daniel Jeronimo-Rodas. As is discussed more fully below, having considered the pleadings, the filings of the parties, the testimony of the witnesses, the exhibits admitted into evidence, and the arguments of counsel, the Court denies both Motions to Suppress.

## **Background**

In late 2012, a confidential informant gave information to agents with the Bureau of Immigration and Customs Enforcement ("ICE") that illegal immigrants were living at a particular residence in Conway, South Carolina. The informant also told the agents that these subjects had firearms in the residence, and that one of the illegals named "Ivan" drove a burgundy SUV with South Carolina license tag number GAH628. According to the testimony of Homeland Security Agent Victor Gomez, the agent in charge of the investigation, the informant also indicated that the illegal immigrants drove a white GMC Sonoma and a black Chevy Impala.

In the early morning of February 15, 2013, various law enforcement officials, including ICE agents, Homeland Security agents, and officers with the Horry County Police Department, conducted surveillance on the residence at issue. The agents identified three vehicles parked at the residence: a white GMC Sonoma, a black Chevy Impala, and a burgundy SUV with South Carolina

license tag number GAH628.

## I. Factual overview regarding Defendant Ernesto Ivan Jeronimo-Rodas

Sometime around 6:30 a.m., Agent Gomez observed the Sonoma exiting the residence and radioed Horry County Police Officer Justin Cole to inform him of this development. Officer Cole testified that he briefly followed the Sonoma, which Officer Cole testified was going approximately 70 miles-per-hour in a 55 mile-per-hour zone, before stopping the vehicle. There were two men in the vehicle, and Officer Cole identified the driver as Paul Greenwood and the passenger as Defendant Ernesto Ivan Jeronimo-Rodas ("Ernesto"). Two other officers, Detective Robert Bittner from the Charleston County Police Department and Agent Jose Roman from ICE, met Officer Cole at the stop. Both Officer Cole and Agent Roman testified that Officer Cole told Ernesto that Homeland Security agents were at the residence, but that Ernesto was free to leave. The officers also testified that Officer Cole asked if Ernesto would be willing to return with him back to the home. After Ernesto agreed, he rode unrestrained in the passenger seat of Officer Cole's unmarked police car while Mr. Greenwood followed in the Sonoma.

During this brief ride, Officer Cole testified that he asked Ernesto if, for officer safety purposes, there was anything in the home that could be harmful to the officers. At that point Ernesto said there were guns at the residence. Upon arriving at the residence, Ernesto exited the vehicle, Officer Cole advised Ernesto of his *Miranda* rights, and Ernesto consented to a search of the home. Ernesto was not restrained. At some point shortly thereafter, Agent Gomez spoke with Ernesto outside the residence and asked him if he was in the country illegally. Ernesto admitted he was in the country illegally and Agent Gomez again *Mirandized* Ernesto and arrested him. All the officers involved testified that Ernesto was cooperative, agreeable and forthcoming.

2

## II. Factual overview regarding Defendant Daniel Jeronimo-Rodas

Shortly after the Sonoma left the residence, Agent Gomez observed another individual exit the residence, start one of the vehicles, and return to the residence. Agent Gomez knocked on the door of the residence and Defendant Daniel Jeronimo-Rodas ("Daniel") answered. After identifying himself as an agent with Homeland Security, Agent Gomez, who is fluent in both English and Spanish, requested permission to enter the residence. Daniel refused, at which point Agent Gomez asked Daniel if he had any paperwork for any of the vehicles and if he would be willing to retrieve it. Daniel agreed, and walked to one of the cars with Agent Gomez to retrieve the registration. Agent Gomez asked if he could see Daniel's identification, and Daniel produced a Mexican passport and told Agent Gomez that the vehicle was his. At this point, Agent Gomez asked if Daniel was in the country illegally and Daniel admitted that he was.

Agent Gomez placed Daniel under arrest and informed him of his *Miranda* rights. Agent Gomez testified that Daniel admitted to having a handgun in the residence, consented to a search, and physically walked inside with officers to point out the location of the handgun in his bedroom.

## Discussion

Ernesto and Daniel request that the Court suppress both the firearms and their statements to police officers. The Court will address each Defendant in turn.[1]

---

[1] For the first time at the hearing, both Ernesto and Daniel appeared to argue that the information from the confidential informant was stale because he gave his information to ICE several months prior to the February 15, 2013, surveillance. However, the Court finds this argument unavailing. First, the agents corroborated the informant's information the morning of the surveillance when they saw the various vehicles identified by the informant at the address identified as the *residence* of the illegal immigrants. Second, the criminal activity being investigated, particularly illegal immigration, was of type that is continuing in nature. *See United States v. Henry*, 673 F.3d 285, 290–91 (4th Cir. 2012) (holding that while affidavit contained stale statements from three sources, many of the details provided by the sources were

**I.     Ernesto Ivan**

The Court concludes, based on the totality of the circumstances, that Ernesto's statements and the subsequent discovery of the firearms should not be suppressed.

First, the stop of Sonoma in which Ernesto was traveling was proper as it was supported by both reasonable suspicion and probable cause. The law enforcement officers had information from an informant, who Agent Gomez credibly testified was reliable, that illegal immigrants resided at the residence, that they were in possession of firearms, and that they drove the vehicles seen at the residence, including the Sonoma. Thus, when the Sonoma left the residence, the officers had reasonable suspicion to believe one or more of its occupants were the illegal immigrants referenced by the informant. The Court notes that when Ernesto identified himself using the name Ivan, this further bolstered the credibility of the confidential informant and enhanced the reasonable suspicion

---

corroborated by independent investigation); 68 Am. Jur. 2d Searches and Seizures § 204 ("In analyzing [staleness], the timeliness of the information supplied depends on the circumstances of the case, including the nature of the crime under investigation, but the lapse of time is least important where the then-suspected criminal activity is continuing in nature and where the property is not likely to be destroyed or dissipated.") Third, this is not a case where law enforcement officers based a search warrant on stale information. Even assuming the law enforcement officers would have lacked probable cause to obtain a search warrant because of any staleness, they were at the residence for the purpose of surveillance and investigation because the informant's information, corroborated after spotting the vehicles, gave them reasonable suspicion of criminal activity. *See United States v. Farmer*, 370 F.3d 435 (4th Cir. 2004) (holding that in determining staleness for purposes of probable cause, the court "must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized"); *see also United States v. Leasure*, 319 F.3d 1092, 1099 (9th Cir. 2003) (relied on by the Fourth Circuit in *Farmer* and holding that six-month old information not stale, in part because narcotics operation was elaborate and ongoing); *United States v. Spry*, 190 F.3d 829, 836 (7th Cir.1999) (also relied on in *Farmer* and finding that nine-month old information not stale given evidence of "ongoing continuous criminal activity").

of the officers.

In addition, Officer Cole credibly testified that he pulled behind the vehicle, paced its speed, and determined it was traveling approximately 70 miles-per-hour in a 55 mile-per-hour zone. *United States v. Sowards*, 690 F.3d 583, 592–93 (4th Cir. 2012) (describing at least two ways where an officer's visual speed estimate may constitute probable cause: (1) where an officer estimates that a vehicle is traveling in significant excess of the legal speed limit; and (2) where an officer estimates that a vehicle is traveling in only slight excess of the legal speed limit and that estimate is supported by radar, pacing methods, or other indicia of reliability). The testimony from the driver of the vehicle, Paul Greenwood, provided further support for Officer Cole's assessment that the Sonoma was speeding. Although Mr. Greenwood first testified he was not speeding, he admitted that when he noticed the blue lights of the police car he was traveling between 55 and 60 miles-per-hour. Therefore, Officer Cole had probable cause to stop the Sonoma.[2]

Second, under the totality of the circumstances, Ernesto was not in custody when he spoke with the officers, voluntarily agreed to ride back to the residence with Officer Cole, and rode back

---

[2] There was some evidence offered by Officer Cole that he stopped the vehicle not for speeding, but in order to investigate whether the vehicle's occupants were illegal immigrants in possession of firearms. Even if this is true, and even if there was not reasonable suspicion to stop the Sonoma on the basis of the information provided by the confidential informant, the fact that the Sonoma was speeding still makes Officer Cole's stop valid. The Fourth Circuit has adopted a "purely objective" test in examining pretextual traffic stops. *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). "Under the objective test, if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity . . . ." *Id*. The objective test applies however minor the traffic violation.

to the residence with Officer Cole.[3] An individual is "in custody" – and subject to *Miranda* safeguards – despite the lack of formal arrest when, under the totality of the circumstances, his or her "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks omitted). Thus, "[t]he operative question is whether, viewed objectively, 'a reasonable man in [the defendant's] position would have understood his situation' to be one of custody." *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010) (quoting *Berkemer*, 468 U.S. at 442).

Officer Cole credibly testified that he advised Ernesto that Homeland Security was at the residence, that he asked Ernesto if he would be willing to ride back to the residence, that Ernesto agreed to ride back to the residence, and that he informed Ernesto that he was free to go. Further, Agent Roman credibly testified that Officer Cole told Ernesto he was free to leave and that Ernesto consented without hesitation to return to the residence. It is also undisputed that Ernesto was not in handcuffs during this encounter. Under the totality of the circumstances, Ernesto was not in custody during his initial discussion with Officer Cole and he freely and voluntarily agreed to return to the residence.

During the ride back, Officer Cole asked Ernesto, for officer safety purposes, if there was

---

[3] Ernesto argued in his Motion to Suppress, but not at the hearing, that Officer Cole impermissibly extended the traffic stop of the Sonoma. However, the testimony of Officer Cole, Detective Bittner, and Agent Roman was credible on the issue that the stop of the Sonoma was relatively brief. Additionally, both Officer Cole and Agent Roman credibly testified that within a very short period of time after exiting the car, Ernesto was informed he was free to leave at any time. *See United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998) ("When [a traffic stop] is over and its purpose served, however, mere questioning by officers, without some indicated restraint, does not amount either to custody for *Miranda* purposes or a seizure under the Fourth Amendment.").

anything that could harm the officers at the residence, including guns. Ernesto responded that there were two guns at the residence. Ernesto argues this amounted to a custodial interrogation and thus Officer Cole should have *Mirandized* Ernesto before asking him any questions. The Court disagrees. The Fourth Circuit has ruled that questioning by police in an environment under their control does not necessarily make such questioning a custodial interrogation. As the Fourth Circuit has explained:

> The fact that the questioning takes place at a police station is not by itself enough to establish custody so long as the individual being interviewed would perceive that his freedom of movement was not constrained to a degree associated with arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983). The Court has further held that even a clear statement by an officer that the person being questioned is a suspect does not alone determine custody, but is only "one among many factors" that bear on an assessment of whether a reasonable person would feel free to depart. *Stansbury v. California*, 511 U.S. 318, 325 (1994). The Court has held, in fact, that *Miranda* warnings are not required when a suspect voluntarily accompanies police to the station, answers questions, and then is allowed to leave. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

*United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997); *see also United States v. Uzenski*, 434 F.3d 690, 704–05 (4th Cir. 2006) (holding that suspect was not in custody where he voluntarily came to law enforcement agency's office, was questioned with door open at times, and was told he was free to leave at any time); *United States v. Thomas*, 142 Fed. App'x 896 (6th Cir. 2005) (holding that a defendant was not in custody for *Miranda* purposes where he was briefly questioned in a police car, on a public street, and without handcuffs).

Some facts relevant to whether Ernesto was in custody for *Miranda* purposes are as follows: (1) Officer Cole told Ernesto he was free to leave; (2) Officer Cole only requested that Ernesto return to the residence with him, and Ernesto agreed; (3) Mr. Greenwood did not dispute that they were only requested to return to the residence; (4) it is undisputed that Ernesto rode unrestrained; (5) it is undisputed that Ernesto rode in the front passenger seat; and (6) the ride to the residence was

7

extremely limited in duration as the residence was a short distance from the initial traffic stop. The Court finds that, under the totality of the circumstances, Ernesto was not in custody for *Miranda* purposes when Officer Cole briefly questioned him in the police car and Ernesto admitted he had guns in the residence.[4]

Third, upon arriving at the residence and after Officer Cole read Ernesto his *Miranda* rights, Ernesto consented to a search of the residence. In determining whether consent to search was freely and voluntarily given, the Court must examine the totality of the circumstances surrounding the consent. *Ferguson v. City of Charleston, S.C.*, 308 F.3d 380, 396 (4th Cir. 2002); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."); *United States v. Boone*, 245 F.3d 352, 362–63 (4th Cir. 2001) (holding that consent given while in custody may nevertheless be voluntary).

Here, Officer Cole, Agent Gomez and Detective Bittner all testified credibly that Ernesto consented to a search of the residence and that he was very cooperative during this time. In fact, Detective Bittner credibly testified that Ernesto volunteered keys so that officers could search any of the buildings on the property. In addition, Ernesto consented to the search after voluntarily

---

[4] In the alternative, to the extent Ernesto was in custody during the car ride to the residence, the public safety exception would allow these statements to be admitted. *See New York v. Quarles*, 467 U.S. 649, 655–56 (1984) (permitting pre-*Miranda* questioning regarding weapons, drug use, or other matters relevant to the safety of the officers or members of the public). On both cross and direct Officer Cole credibly testified that he was concerned for officer safety. During the brief ride to the home, in which the officers had reason to believe armed illegal immigrants were residing, Officer Cole asked a limited question regarding whether there was anything in the house that could harm the officers.

8

returning to the home, Ernesto was not restrained when he consented to the search, there was a very limited between when Officer Cole stopped the Sonoma and when Ernesto consented to the search, and there is no evidence that the search was unnecessarily lengthy. To the extent Ernesto attempts to argue that he lacked understanding as a result of poor English, Agent Gomez is bilingual and credibly testified that Ernesto understood his questions in both English and Spanish. In viewing the totality of the circumstances, the Court finds that Ernesto freely, voluntarily and knowingly consented to the search of the residence.

The Court therefore denies Ernesto's Motion to Suppress.[5]

## II. Daniel

The Court also finds that, based on the totality of the circumstances, Daniel's statements and the subsequent discovery of the firearm over which he claimed ownership should not be suppressed.

First, Agent Gomez's conversation with Daniel did not give rise to a custodial interrogation under *Miranda*. Agent Gomez credibly testified that he knocked on the door of the residence, identified himself as an agent with Homeland Security, and ultimately requested permission to enter the residence. After Daniel refused, Agent Gomez credibly testified that, upon Agent Gomez's requests, Daniel said he was willing to show Agent Gomez the registration to one of the vehicles outside, willingly showed Agent Gomez his identification, and, after inquiry by Agent Gomez, admitted he was here illegally.

---

[5] After Ernesto was *Mirandized* by Officer Cole, Agent Gomez questioned him regarding his legal status. At that point Ernesto admitted he was in the country illegally. It is unclear whether Ernesto is also challenging this statement. To the extent he seeks to make such a challenge, the Court finds it without merit. Ernesto had been read his *Miranda* rights by Officer Cole, there is no evidence he ever asked to speak to an attorney, and he freely and voluntarily answered Agent Gomez's questions with an understanding of his *Miranda* rights.

9

There is no indication from the evidence or testimony that, when viewed objectively and under the totality of the circumstances, would indicate that Daniel was in custody for *Miranda* purposes. As the Fourth Circuit has explained, "just as private citizens may approach a home, absent contrary instructions from the owner, to knock on a door, so may the police approach without probable cause, a warrant, or exigency." *Rogers v. Pendleton*, 249 F.3d 279, 289 (4th Cir. 2001). Further, this entire encounter took a matter of minutes, occurred on Daniel's own property, and was part of Agent Gomez's efforts to examine the allegations made by a confidential informant. *See Oregon v. Elstad*, 470 U.S. 298, 315 (1985) (holding environment not coercive where suspect interviewed at home); *Miranda v. Arizona*, 384 U.S. 436, 477–78 (1966) ("General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding."); *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (holding that "no suspicion needed to be shown in order to justify the 'knock and talk' "); *United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998) ("[M]ere questioning by officers, without some indicated restraint, does not amount either to custody for *Miranda* purposes or a seizure under the Fourth Amendment."); *United States v. Casteneda-Arrellano*, No. 3:06cr370, 2007 WL 430166, at *3 (W.D.N.C. Feb. 2, 2007) ("A 'knock and talk' is a consensual encounter and therefore does not violate the Fourth Amendment, even absent reasonable suspicion.").

Second, Daniel argues in his Motion that he was seized when Agent Gomez began questioning him at the door. Even assuming Daniel was seized by Agent Gomez and not free to leave, any such seizure was supported by reasonable suspicion. So long as a seizure is supported by reasonable suspicion, it is clearly established that an officer may engage in an investigatory detention of a citizen by way of a *Terry* stop. *See United States v. Black*, 707 F.3d 531, 537 (4th Cir.

2013) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Further, an officer is not required to give *Miranda* warnings during a *Terry* stop. *See United States v. Day*, 591 F.3d 679, 683 n.3 (4th Cir. 2010).

Here, as discussed previously in this Order, under the totality of the circumstances there was at least reasonable suspicion for Agent Gomez to talk to Daniel. A reliable confidential informant said there were illegal immigrants at the residence, the informant also said the illegal immigrants had weapons, and the vehicles specifically identified by the informant as belonging to the illegal immigrants were in the yard. Thus, even if Agent Gomez seized Daniel, any such seizure was supported by reasonable suspicion, was limited in both time and duration, and Agent Gomez was therefore not required to read Daniel his *Miranda* rights before questioning him. *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995) (" '[T]he person detained is not technically free to leave while the officer pursues the investigation,' " but "*Terry* stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion." (quoting *United States v. Manbeck*, 744 F.2d 360, 376–77 (4th Cir. 1984))).

Third, once Daniel admitted he was an illegal alien, Agent Gomez detained him and read him his *Miranda* warnings. Daniel then freely and voluntarily admitted he possessed a gun in the residence and consented to a search of the residence. According to the credible testimony of Agent Gomez, Daniel admitted that he owned a silver colored handgun, which was located inside a dresser drawer in his bedroom in the residence, and consented to the search. As discussed above, Daniel was aware he could decline the search request having just done so previously at the door to the residence. *See United States v. Rios*, 443 Fed. App'x 433 (11th Cir. 2011) ("The evidence also showed that Rios was aware of his right to refuse to consent to the search because he twice exercised that right

. . . ."). Further, Agent Gomez testified that after having been read his rights, Daniel was highly cooperative and even walked officers into his bedroom and pointed out the handgun he claimed belonged to him. Under the totality of the circumstances, the Court finds that Daniel freely, voluntarily and knowingly consented to the search.[6]

Based on the forgoing, the Court denies Daniel's Motion to Suppress.

## Conclusion

This Court has thoroughly reviewed the pleadings, the filings by the parties, the testimony and other evidence presented at the hearing, and the applicable law.

**IT IS THEREFORE ORDERED** that Defendant Ernesto Ivan Jeronimo-Rodas's Motion to Suppress [Doc. # 44] is **DENIED**, and Defendant Daniel Jeronimo-Rodas's Motion to Suppress [Doc. # 47] is **DENIED**.

**IT IS SO ORDERED.**

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, South Carolina
May 23, 2013

---

[6] The Court reiterates that Agent Gomez spoke both English and Spanish, and testified credibly that Daniel understood Agent Gomez.